IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| HAROLD SELTZER, *et al.*, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DUNKIN' DONUTS, Inc., *et al.*, | : | |
| Defendants. | : | No. 09-5484 |

## MEMORANDUM

PRATTER, J.　　　　　　　　　　　　　　　　　　　　　　　　　　　　APRIL 20, 2011

**INTRODUCTION**

　　This is a dispute over a franchising relationship gone awry. Two of the Plaintiffs, Harold Seltzer and Saul Levitt (together, "the Franchisees"), allege that Dunkin' Donuts, Inc., Baskin-Robbins USA, and Dunkin' Donuts Franchised Restaurants (collectively, "Dunkin' Donuts") breached a contract pursuant to which Messrs. Seltzer and Levitt would have opened a number of Dunkin' Donuts or Baskin-Robbins franchises in the area of York, Pennsylvania.

　　The four remaining Plaintiffs – AAA Development & Management, AAA Development Group, AAA Yowza and Yowza Enterprises (collectively, "the Entity Plaintiffs"), a collection of business entities related to the Franchisees – each assert a set of four nearly-identical claims against Dunkin' Donuts, all stemming from the breakdown of the franchising relationship between the Franchisees and Dunkin' Donuts.

　　Dunkin' Donuts has moved to dismiss all of the Entity Plaintiffs' 16 claims. For the reasons set forth below, the Motion to Dismiss will be granted in part and denied in part.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The Dunkin' Donuts Defendants are Delaware corporations based in Massachusetts; Mr. Seltzer is a citizen of New Jersey; Mr. Levitt is a citizen of Maryland; the Entity Plaintiffs are citizens of New Jersey; and the amount in controversy substantially exceeds $75,000.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

For the purposes of a motion to dismiss, facts alleged in the complaint are considered to be true. On that basis, the facts are as follows.

In July of 2005, the Franchisees entered into a Store Development Agreement ("the SDA") with Dunkin' Donuts. The SDA granted the Franchisees the right to open a specified number of Dunkin' Donuts shops pursuant to a schedule, but required that they obtain Dunkin' Donuts' written approval for each location at which they proposed to develop a shop. Article 6 of the SDA notes that "each [franchise] location proposed to be acquired by [the] Developer shall be submitted in writing in advance to [the] Licensor [i.e., Dunkin' Donuts] for approval." Article 19 specifies that "[n]o amendment, change, or variance from this Agreement shall be binding on either party unless executed in writing."[2]

The Entity Plaintiffs were not parties to the SDA between the Franchisees and Dunkin'

---

[1] Dunkin' Donuts removed this case from the Court of Common Pleas for Bucks County, Pennsylvania, where it was originally filed. The Court denied the Plaintiffs' Motion to Remand, holding that the contract between the Franchisees and Dunkin' Donuts cannot be interpreted as barring the removal of this case to federal court.

[2] The Court may consider documents which are referenced in or integral to the Complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

2

Donuts. (In fact, each of them appears to have been created after it was signed.) Based upon the Complaint and the Motion to Dismiss, however, it is clear that they were intimately related to the Franchisees, and indeed existed principally or solely to develop, own and/or operate franchises that would be created pursuant to the SDA. The Complaint indicates that AAA Development & Management ("AAA Development") contracted with the Franchisees to develop all of the shops contemplated by the SDA; that the AAA Development Group ("the AAA Group") was created to operate a specific shop on South George Street in York ("the South George Property"); that AAA Yowza was created to own another on Mount Rose Avenue in York ("the Yowza Property"); and that Yowza Enterprises was created to operate the Yowza Property.[3]

According to the Plaintiffs, Dunkin' Donuts provided "unconditional" approval of the South George Property, as was required under the terms of the SDA. The Complaint alleges that after receiving this approval, and in reliance upon its legal force, and with the full knowledge of Dunkin' Donuts, the AAA Group leased the South George Property from its owner, and the AAA Group, AAA Development, and the Franchisees expended time and money on its development. Yet, according to the Plaintiffs, Dunkin' Donuts reversed itself without warning or justification,

---

[3] The Motion to Dismiss further indicates that Mr. Seltzer participated in the formation of each Entity Plaintiff, and was also an officer of three of them. Although Mr. Seltzer does not appear to have been an officer of the fourth Entity Plaintiff, the president of that fourth Entity Plaintiff, Joseph Glassman, shared a business address with Mr. Selzer. Dunkin' Donuts also notes that the Entity Plaintiffs shared the same registered office address in York.

As its source for this information, Dunkin' Donuts cites records of the Pennsylvania Secretary of State. The Court may consider this information in the context of a motion to dismiss because the rosters and business addresses of the Entity Plaintiffs are a matter of public record. *See* Wright & Miller, *Federal Practice and Procedure*, § 1357; *Chester Co. Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir. 1990).

revoking its approval and thus harming the Plaintiffs involved in this project.[4]

The Plaintiffs claim that despite this setback, they continued to operate in accordance with the terms of the SDA. According to the Complaint, Dunkin' Donuts "unconditionally" approved a second store site, on the Yowza Property, and after receiving this approval, and in reliance upon its legal force, and with the full knowledge of Dunkin' Donuts, AAA Yowza, Yowza Enterprises and Mr. Levitt entered into some kind of lease and operation agreement in regard to the Yowza Property, and AAA Development, AAA Yowza, Yowza Enterprises and the Franchisees spent time and money on its development. (The Plaintiffs assert, for example, that they began the arduous process of obtaining development approval from township regulators, which was required before a store could open for business on the Yowza Property.)

Although the Complaint is not a model of narrative or terminological clarity, the Plaintiffs evidently believe that as they were preparing to open a store on the Yowza Property, Dunkin' Donuts undertook a clandestine plot to undermine the Plaintiffs' business interests and rights under the SDA. The goal of this alleged plot was to install another franchisee company, Men at Work, Inc., as the franchisee for all Dunkin' Donuts and Baskin-Robbins stores in the geographic area covered by the Franchisees' SDA. In service of this objective, Dunkin' Donuts allegedly began to inform the Franchisees that they were in danger of violating the SDA, so as to lay a foundation for the Agreement's future termination.[5]

---

[4] The Parties agree that without the approval of Dunkin' Donuts, no store could open on the South George Property. Plaintiffs allege that the revocation of approval led to a $200,000 judgment against the AAA Group in the Court of Common Pleas for York County.

[5] Specifically, the Complaint proposes that Dunkin' Donuts believed that by terminating the SDA, it could retain the consideration paid by the Franchisees ($500,000), and then "resell" the Franchisees' sites to Men at Work, thereby reaping a substantial windfall profit.

In the summer of 2007, after a period of tension regarding the pace of development of new properties under the SDA, Dunkin' Donuts allegedly threatened – during a meeting with the Franchisees and "a representative of AAA Development and AAA Yowza" (*viz.*, Mr. Glassman, referenced in fn. 3, *supra*) – that it would claim breach of contract and terminate the SDA if the Franchisees refused to transfer their rights and obligations under the SDA either to Men at Work or to Dunkin' Donuts itself. When the Plaintiffs responded that they were already aware of *other* potential third-party assignees, Dunkin' Donuts allegedly told them that they should not sell their rights to any of these candidates, because Dunkin' Donuts now sought to work exclusively with larger franchisees (a category which presumably included Men at Work).

At this same meeting, Dunkin' Donuts allegedly informed the Plaintiffs that the SDA would be "extended," partly for the purpose of allowing the Franchisees to sell their rights to Men at Work or Dunkin' Donuts prior to any contractual breach (which could complicate the assignment).[6] The Plaintiffs also allege that they insisted, and that Dunkin' Donuts agreed, that any third-party buyer of the Franchisees' rights and obligations under the SDA would agree to develop the Yowza Property – thereby, it seems, protecting at least some of the investment in that site made by AAA Development, AAA Yowza, Yowza Enterprises and the Franchisees.

Months after the summer 2007 meeting, in February of 2008, Dunkin' Donuts allegedly provided the Franchisees with a document entitled "First Amendment to Store Agreement" ("the SDA Amendment"), in which Dunkin' Donuts agreed to extend opening deadlines for a number of the stores contemplated by the SDA. The SDA Amendment, which is attached as an exhibit to

---

[6] Specifically, the Complaint asserts that "Dunkin' Donuts informed the present parties that the SDA would be extended ... ." Viewing this ambiguous language in context, the Plaintiffs seem to mean that Dunkin' Donuts agreed to extend certain deadlines in the SDA.

the Complaint, also specifies "revised control date[s]" for every listed store, with each "control date" scheduled exactly one year prior to the store's new (i.e., extended) deadline. The Plaintiffs imply that the term "control date" was not known to them, and they assert that it was not defined in either the SDA Amendment or the SDA itself.[7]

The first "control date" identified in the SDA Amendment was August 28, 2008. The Plaintiffs say that they interpreted this date as a deadline for the submission of certain "control documents" (another undefined term), and that they believed they could satisfy this requirement by submitting "a signed lease between Yowza Enterprises and AAA Yowza for the occupancy of the Yowza Property to operate the Dunkin' Dontus/Baskin-Robbins." The basis for this belief is not entirely clear from the Complaint. The Franchisees indicate that they sent these documents to Dunkin' Donuts via overnight mail, and received a return receipt showing that the documents had been delivered on August 25, 2008. Although the Complaint is once again ambiguous, the order of its factual assertions at least implies that the Plaintiffs responded to this proof of delivery by executing a contract amongst themselves, under the terms of which Yowza Enterprises agreed to pay AAA Yowza $350,000 to develop the Yowza Property.

Somewhat puzzlingly, in light of the return receipt, there seems to be a concession in the Complaint that Dunkin' Donuts actually received the "control documents" submission on August 29, 2008, one day after the deadline for their submission had passed. Apparently in response to the Franchisees' failure to meet the deadline, Dunkin' Donuts "issued a correspondence" indicating that the Franchisees had defaulted on their obligations under the SDA Amendment,

---

[7] The Plaintiffs assert that "by February of 2008," the Franchisees had attempted to assign their rights and obligations under the SDA to a credit-worthy purchaser, Mukeshbai Patel, but that Dunkin' Donuts had "unreasonably and unjustifiably" withheld approval.

6

and would be granted 30 days to cure that default.[8] Mr. Seltzer objected to this correspondence in a September 25, 2008 email to a representative employee of Dunkin' Donuts, in which he asserted that the Franchisees had, in fact, submitted all required "control documents," and therefore were not in default.[9] In response, the representative employee sent Mr. Seltzer an email telling him that although Dunkin' Donuts had received the documents relating to the Yowza Property, the Franchisees were "not certified to expand" – language that the Plaintiffs did not recognize from earlier communications.

Finally, on October 2, 2008, Dunkin' Donuts sent the Franchisees a termination letter, notifying them that Dunkin' Donuts was terminating the SDA. Dunkin' Donuts' stated basis for terminating the SDA was that the Franchisees had failed to meet the August 28, 2008 "control document" deadline – a justification that the Plaintiffs describe as illegitimate and pretextual, an excuse to allow Dunkin' Donuts to enter into a new SDA with Men at Work.

In their Complaint, the four Entity Plaintiffs have asserted a total of 16 claims against Dunkin' Donuts. Each of the four Entity Plaintiff alleges (1) that it was a third-party beneficiary of agreements between the Franchisees and Dunkin' Donuts; (2) promissory estoppel in relation to the South George Street and Yowza Properties; (3) that Dunkin' Donuts' termination of the SDA tortiously interfered with its own contracts with the Franchisees; and (4) that Dunkin' Donuts fraudulently misrepresented its intentions with regard to sites identified in the SDA.

---

[8] According to the Plaintiffs, the "incredible speed by which Dunkin' Donuts dictated a letter and got it to the Franchisees" is evidence that Dunkin' Donuts was seeking a pretextual basis to terminate the SDA as part of its alleged Men at Work plot.

[9] The Complaint does not say when Dunkin' Donuts "correspondence" regarding default was "issued," and it is not clear why Mr. Seltzer submitted an objection almost a month after the deadline and document submissions in late August.

These claims are presented in Counts II through XVII of the Complaint,[10] all of which Dunkin' Donuts has moved to dismiss. It argues that (1) all of the Entity Plaintiffs' claims are barred by the "gist of the action" doctrine; and (2) that even if this doctrine does not apply, the Complaint fails to plead the necessary elements of each claim. For the reasons set forth below, the Court will not apply the "gist of the action" doctrine, but will dismiss the Entity Plaintiffs' third-party beneficiary and tortious interference claims pursuant to Rule 12(b)(6).

**LEGAL STANDARDS**

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) tests the legal sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). While Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*quoting Conley*, 355 U.S. at 47), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level ... ." *Id.* at 1965 (citations omitted). To survive a motion to dismiss, a civil complaint must allege "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct.

---

[10] Counts II-V assert third-party beneficiary, promissory estoppel, tortious interference and fraudulent misrepresentation claims against Dunkin' Donuts on behalf of AAA Development; Counts VI-IX assert the same claims on behalf of the AAA Group; Count X-XIII assert the same claims on behalf of AAA Yowza; and Counts XIV-XVII assert the same claims on behalf of Yowza Enterprises.

8

1937, 1950-51 (2009) (confirming that *Twombly* applies to all civil cases).

To be sure, however, a complaint need not be "a model of the careful drafter's art," nor must it "pin plaintiffs' claim for relief to a precise legal theory," as long as it features "a plausible 'short and plain' statement of the plaintiff's claim." *Skinner v. Switzer*, 179 L. Ed. 2d 233, 242 (2011); *see also Matrixx Initiatives, Inc. v. Siracusano*, 179 L. Ed. 2d 398, 414 at n. 12 (2011) (emphasizing that in order "to survive a motion to dismiss, respondents need only allege 'enough facts to state a claim to relief that is plausible on its face'") (*quoting Twombly*, 550 U.S. at 570)).

**DISCUSSION**

**I.** *Choice of Law*

As a general matter, "where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question." *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997); *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir.1994).

In this case, the parties agree that the SDA contains an enforceable choice-of-law provision, specifying that all disputes arising thereunder will be settled under Massachusetts law.[11] This provision is explicit and broad, encompassing not merely claims under the contract,

---

[11] Paragraph 18(D) of the SDA specifies that outside of arbitration, "the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles."
  "In contract disputes, Pennsylvania courts generally honor the parties' choice of law provisions." *Nationwide Mut. Ins. Co. v. West*, 807 A.2d 916, 920 (Pa. Super. Ct. 2002).

but also other claims "arising out of or relating to the parties' contractual relationship."[12] While the close relationship between the Franchisees (who were signatories to the SDA) and the Entity Plaintiffs (who were not) raises some question as to whether the SDA's choice-of-law provision might apply to the Entity Plaintiffs' claims, the Court does not need to resolve this question, because the answer would not affect its ruling as to any portion of the Motion to Dismiss.

**II.     *"Gist of the Action" Doctrine***

Dunkin' Donuts argues that all of the Entity Plaintiffs' claims should be dismissed pursuant to the "gist of the action" doctrine, which operates in Pennsylvania to bar plaintiffs from bringing any tort claim that "merely replicates a claim for breach of an underlying contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 n.8 (3d Cir. 2002) (applying Pennsylvania law). Pennsylvania courts have invoked this doctrine in cases in which plaintiff asserts that defendant has breached a contract, and appends a tort claim that is collateral to, or dependent upon, the allegations of contractual nonperformance. *See, e.g., First Republic Bank v. Brand*, 50 Pa. D. &

---

[12]     Under Pennsylvania law, the general rule is that a contract's choice-of-law provisions will only apply to related tort claims where the contract clearly indicates that the parties intended to "encompass all elements of their association." *Jiffy Lube Intern., Inc. v. Jiffy Lube of Pa., Inc.*, 848 F.Supp. 569, 576 (E.D. Pa. 1994).
     Under Massachusetts law, "choice-of-law provisions will govern ... tort actions that arise from a breach of contract if breach is an essential element of the tort claim." *NPS LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 169 (D. Mass. 2010) (applying Massachusetts law). This rule does not apply to claims based on conduct prior to contract formation. *Id.*; *Northeast Data Sys. v. McDonnell Douglas Computer Sys.*, 986 F.2d 607, 609-611 (D. Mass. 1993) (noting that although tort claims alleging "serious" or "rascal-like" conduct in connection with breach of contract should be governed by choice-of-law provisions, a fraudulent inducement claim should not, since it alleges wrongdoing antecedent to contract formation).

C. 4th 329, 338 (C.P. Phila. 2000).[13]

Although Dunkin' Donuts has suggested that some version of Pennsylvania's "gist of the action" doctrine may have been embraced by Massachusetts courts, the Court finds no support for this proposition. In Massachusetts, the "gist of the action" has been a matter of interest where a court is attempting to determine the appropriate statute of limitations for a claim that sounds in tort but which has the "essential nature" of a contract claim, or *vice versa*.[14] One of the cases cited by Dunkin' Donuts, *Springfield Library & Museum Ass'n v. Knoedler Archivum, Inc.*, 341 F. Supp. 2d 32 (D. Mass. 2004), was decided in this context. In the other, *Redgrave v. Boston Symphony Orchestra*, 557 F. Supp. 230, 238 (D. Mass. 1983), the court observed that:

> Rights are not to be determined by playing a game of labels. If the relationship of the parties is such as to support a cause of action in tort, that cause of action is not to be denied because the parties happened also to have made a contract. Conversely, a breach of contract is not, standing alone, a tort as well. And it cannot be converted into a tort merely by attaching to the contract, or

---

[13] The purpose of the Pennsylvania "gist of the action" doctrine is "to maintain the distinction between the theories of breach of contract and tort," and to "preclude a plaintiff from recasting ordinary breach of contract claims into tort claims." *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 340 (*citing Bash v. Bell Tel. Co. of Penn.*, 411 Pa. Super. 347, 601 A.2d 825, 829 (Pa. Super. 1992)); *see also eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10 (Pa. Super. Ct. 2002).

[14] *See, e.g.*, *Hendrickson v. Sears*, 365 Mass. 83, 310 N.E.2d 131, 132 (Mass. 1974) (noting that the "gist of the action or the essential nature of the plaintiff's claim" rather than "the form of proceeding" determines the applicable statute of limitations); *Oliveira v. Pereira,*, 605 N.E.2d 287, 290 (Mass. 1992) (same); *Siebe, Inc. v. Louis M. Gerson Co., Inc.*, 908 N.E.2d 819, 830 (Mass. App. Ct. 2009) (same); *Barber v. Fox*, 632 N.E.2d 1246, 1249 (Mass. App. Ct. 1994) (same); *see also Loguidice v. Metro. Life Ins. Co.*, 336 F.3d 1, 4 (1st Cir. 2003) (same, applying Massachusetts law); *Desmond v. Moffie*, 375 F.2d 742, 743 (1st Cir. 1967) (same); *Fin. Res. Network v. Brown & Brown, Inc.*, 2010 U.S. Dist. LEXIS 122358, *72 (D. Mass. 2010) (same); *Cambridge Literary Props. v. W. Goebel Porzellanfabrik, et al.*, 448 F. Supp. 2d 244, 263 (D. Mass. 2006) (same); *Palandjian v. Pahlavi*, 614 F. Supp. 1569, 1577 (D. Mass. 1985) (same).

to the breach, new labels that sound in tort. Calling a "breach of contract" a "tortious repudiation of contract" is no more helpful in identifying a ground of tort liability than would be an argument that every breach of contract – or perhaps every willful breach – is a tort.[15]

This language makes clear that a "a breach-of-contract claim, without more, cannot be converted into a tort claim." *Lyle Richards Int'l v. Ashworth, Inc.,* 132 F.3d 111, 115 (1st Cir. 1997) (*citing Redgrave*, 557 F. Supp. at 238). It does not, however, support Dunkin' Donuts' theory that Massachusetts courts recognize a Pennsylvania-style "gist of the action" doctrine – which not only bars tort claims that essentially sound in contract or duplicate a contract claim, but also those which are collateral to or dependent upon an allegation of nonperformance. *See, e.g., First Republic Bank*, 50 Pa. D. & C. 4th at 338.

At any rate, even if the Court were to apply Pennsylvania law, the "gist of the action" doctrine would obviously not be applicable because although the Entity Plaintiffs are clearly related to the Franchisees in a practical sense, the Court lacks sufficient basis, at this stage in the litigation, to ignore their separate legal personality. Dunkin' Donuts has not cited any cases in which the doctrine has been applied to bar tort claims filed by an entity or person that is merely connected to a party filing a contract claim[16] – and absent factual development or persuasive legal authority, it would be precipitous for the Court to set aside the formal independence of the Entity

---

[15] In less legalistic terms, the underpinning of this call-it-like-it-is analysis is suggestive of the famous quote from the American labor leader James B. Carey: "When someone walks like a duck, swims like a duck, and quacks like a duck, he's a duck."

[16] The Pennsylvania Superior Court has suggested that the economic loss doctrine, which is related to the "gist of the action" doctrine, may apply to tort claims filed by third-party beneficiaries of a contract. *David Pflumm Paving & Excavating, Inc. v. Foundation Srvcs. Co.*, et al., 816 A.2d 1164 (Pa. Super. 2003). However, neither of the parties in this case has argued that the Entity Plaintiffs were third-party beneficiaries of the SDA.

Plaintiffs in ruling on their ability to proceed with their tort claims. Finally, the Court will note that although Dunkin' Donuts has categorized all of the Entity Plaintiffs' claims as tort claims, half of these claims actually sound in contract.**17**

### III.   *The Third-Party Beneficiary Claims*

The Entity Plaintiffs' third-party beneficiary claims are based on the theory that each Entity was a third-party beneficiary of "the agreement entered into by and between [Dunkin' Donuts] and [the] Franchisees and by and between Dunkin' Donuts and Men at Work, or such similar corporation, for the purchase of the Franchisees' SDA." While this sentence could be easily interpreted as referring to two separate contracts (*viz.*, one between Dunkin' Donuts and the Franchisees, and another between Dunkin' Donuts and Men at Work or a similar assignee), the Plaintiffs' Response in Opposition to the Motion to Dismiss at least makes clear that the Plaintiffs are not proposing that the Entity Plaintiffs were third-party beneficiaries of the SDA.[18]

---

[17]     The Entity Plaintiffs' third-party beneficiary claims are certainly contract claims. *See* 9 Corbin on Contracts, § 41, *et seq.* In addition, while promissory estoppel has sometimes been said to reside between tort and contract, the Pennsylvania Supreme Court has made clear that "promissory estoppel ... sounds in contract law," *Crouse v. Cyclops Industries*, 745 A.2d 606, 610 (Pa. 2000), and the Massachusetts Supreme Judicial Court has noted that a promissory estoppel action based on reliance "is equivalent to a contract action," *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1179 (Mass. 1995).

[18]     In their Response in Opposition, the Plaintiffs complain that Dunkin' Donuts has misrepresented their argument: "Nowhere in the Complaint do the [Entity] Plaintiffs allege that they were third party beneficiaries to the actual SDA signed in July of 2005."
         The Response summarizes the Plaintiffs' third-party beneficiary theory, but this summary is impossibly convoluted – or at least overtaxes this Court's powers of concentration: "The theory of recovery, under the [Entity] Plaintiffs' third party beneficiary claims ... is that Dunkin' [Donuts] assured the Plaintiffs' that the extension of the SDA deadlines, rather than permitting the Plaintiffs to sell the SDA and on the basis that the [Entity] Plaintiffs had already exhausted substantial time and money on the development of the Yowza property, was so that the

The Complaint does not plead facts sufficient to support a claim that the Entity Plaintiffs were third-party beneficiaries of any breached contract. A contract claim cannot be based upon a hypothetical agreement, such as one between Dunkin' Donuts and "Men at Work, *or such similar corporation*." In addition, the Plaintiffs have cited neither contract language nor factual context that would enable the Court to conclude that the Entity Plaintiffs were intended beneficiaries of any contractual agreement between Dunkin' Donuts and any other party or entity.[19] In light of this fact, Counts II, VI, X and XIV of the Complaint will be dismissed.

### IV. *The Promissory Estoppel Claims*

The Entity Plaintiffs' theory of promissory estoppel appears to be that (1) Dunkin' Donuts promised – by way of granting its "unconditional approval" – that it would allow the Entity Plaintiffs, along with the Franchisees, to open franchise stores on the South George Street and Yowza Properties;[20] (2) that by granting such approval, Dunkin' Donuts intended to induce the Entity Plaintiffs to develop these Properties; (3) that the Entity Plaintiffs reasonably relied on Dunkin' Donuts promise of approval in leasing these Properties and spending time and money on their development; and (4) that the Entity Plaintiffs were therefore harmed when Dunkin' Donuts

---

Yowza Property could be opened as a Dunkin' Donuts store."

[19] Massachusetts and Pennsylvania have each adopted Restatement (Second) of Contracts § 302. *See, e.g., Rae v. Air-Speed*, 435 N.E.2d 628 (Mass. 1982) (adopting § 302); *Guy v. Liederbach*, 459 A.2d 744 (Pa. 1983) (same).
In both states, courts have required that plaintiffs show that they are *intended* beneficiaries of a contract in order to recover under a third-party beneficiary theory. *Spinner v. Nutt*, 631 N.E.2d 542, 555 (Mass. 1994); *Scarpitti v. Weborg*, 609 A.2d 147, 150 (Pa. 1992).

[20] The Plaintiffs allege generally that Dunkin' Donuts was aware, when it offered approval, of the Entity Plaintiffs' role in leasing and developing the Properties.

unjustifiably withdrew its approval of these Properties. In addition, the Motion to Dismiss has not identified any duty of inquiry that might bar the Entity Plaintiffs' recovery.

This theory satisfies the basic elements of a promissory estoppel claim under both Pennsylvania and Massachusetts law.[21] Although Dunkin' Donuts is correct that promissory estoppel claims cannot be maintained where the promised alleged is part of a binding contract between the parties, the Entity Plaintiffs were not parties to the SDA (which contains provisions regarding the approval of sites and the withdrawal of such approval). Because each of the Entity Plaintiffs is alleged to have been harmed by the withdrawal of approval of at least one of the two Properties, the Motion to Dismiss is denied with regard to Counts III, VII, XI and XV.

## V.     *The Tortious Interference Claims*

The Entity Plaintiffs claim that by wrongly terminating the SDA, Dunkin' Donuts tortiously interfered with their various contractual agreements with the Franchisees. However, the Complaint's vague references to agreements between the Entity Plaintiffs and the Franchisees

---

[21]     In Pennsylvania, the elements of promissory estoppel are: (1) misleading words; conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel. *Luther v. Kia Motors Am., Inc.*, 676 F. Supp.2d 408, 421 (W.D. Pa. 2009)(applying Pennsylvania law).
    In Massachusetts, a plaintiff must show: (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation by the person to whom it was made; and (3) detriment to such person as a result of the act or omission. *Turnpike Motors, Inc. v. Newbury Group, Inc.*, 413 Mass. 119, 123 (1992).
    These requirements are all met here, as is the requirement of an express promise (i.e., the store approval). *See C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (promissory estoppel would be "rendered meaningless" if plaintiff could maintain such an action based on the alleged existence of "a broad and vague implied promise").

15

are not sufficiently specific to provide the basis for a tortious interference claim.[22]

By way of example, Count VI, asserted on behalf of AAA Development, asserts that Dunkin' Donuts "did intentionally and improperly interfere with the performance of *the contracts* between AAA Development and the Franchisees" and "*the contract* between AAA Development and AAA Yowza" (emphasis added). Although a single development agreement between AAA Development and the Franchisees is attached as Exhibit B to the Complaint, the Court can only speculate that this might be one of the "contracts" to which Count IV refers. As a result, Counts IV, VIII, XII and XVI shall be dismissed.

## VI.   *The Fraudulent Misrepresentation Claims*

The Entity Plaintiffs' fraudulent misrepresentation claims proceed under a theory similar to their promissory estoppel claims. In short, the Entity Plaintiffs assert that (1) Dunkin' Donuts misrepresented – by way of providing its "unconditional" approval of the South George Street and Yowza Properties – its then-existing "true" intention to terminate the SDA and contract with Men at Work;[23] (2) Dunkin' Donuts' goal in misrepresenting its plans was to induce the Entity Plaintiffs to continue developing these Properties (and thus to provide some undeserved benefit

---

[22]   In both Pennsylvania and Massachusetts, a party seeking to establish tortious interference with a contract must, at minimum, allege the existence of a *particular* contractual agreement. *G.S. Enter., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991); *Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 834 (Pa. Super. Ct. 2008).

[23]   As Dunkin' Donuts observes, a fraudulent misrepresentation claim differs from a promissory estoppel claim in that it must be based upon a false representation of an existing fact, rather than a promise of future conduct. It is not, however, conceptually inconsistent to find that in approving the Properties, Dunkin' Donuts could have both: (1) promised to undertake a future course of action (*viz.*, to continue to allow the Entity Plaintiffs to develop the Properties); and (2) misrepresented an existing fact (*viz.*, its alleged intention or plot to contract with Men at Work).

to Dunkin' Donuts); (3) the Entity Plaintiffs reasonably relied upon this misrepresentation; and (4) the Entity Plaintiffs were injured as a result of their reliance.

This is a minimally actionable theory of fraud, and is pled with sufficient particularity to survive the Motion to Dismiss.[24] As a result, the Motion to Dismiss shall be denied with regard to Counts V, IX, XIII and XVII of the Complaint.

**CONCLUSION**

For the reasons set forth above, Dunkin' Donuts' Motion to Dismiss shall be granted with regard to the Entity Plaintiffs' third-party beneficiary claims, which are listed in Counts II, VI, X and XIV of the Complaint, as well as their tortious interference claims, listed in Counts IV, VIII, XII, and XVI.

However, the Motion to Dismiss shall be denied with regard to the Entity Plaintiffs' promissory estoppel claims, which are listed in Counts III, VII, XI and XV of the Complaint, as well as their fraudulent misrepresentation claims, identified in Counts V, IX, XIII and XVII.

An Order to this effect follows.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[24] A plaintiff claiming fraudulent misrepresentation must prove that defendant (1) made a false misrepresentation of a material fact; (2) with knowledge of its falsity; (3) for the purpose of inducing the plaintiff to act thereon; (4) that the plaintiff relied upon it as true; and (5) that the plaintiff acted upon it to his or her detriment. *See Sahin v. Sahin*, 435 Mass. 396 (2001); *Tunis Bros. v. Ford Motor Co.*, 952 F.2d 715, 731 (3d Cir. 1991)(collecting Pennsylvania cases). Of course, Fed. R. Civ. P. 9(b) requires that fraud be pled with particularity.