IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HAROLD SELZER, *et al.*, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| v. | : | |
| | : | |
| DUNKIN' DONUTS, Inc., *et al.*, | : | |
| Defendants. | : | № 09-5484 |

## MEMORANDUM

**PRATTER, J.**                                                                                             AUGUST 26, 2013

In this highly contentious contract dispute, Plaintiffs have sued Franchisor Dunkin' Donuts and other related entities for breach of their Store Development Agreement, as well as for various allegedly tortious conduct related to this breach. Defendants have moved for summary judgment as to all of the claims, and Plaintiffs have filed a cross motion for summary judgment as to the breach of contract claim. Following oral argument and multiple supplementary submissions, the matter is now ripe for decision.

**FACTUAL BACKGROUND**

On July 15, 2005, Harold Selzer and Saul Levitt (hereinafter "Individual Plaintiffs") purchased a Store Development Agreement ("Agreement") from Defendants. Plaintiff AAA Development & Management ("AAA Development") is a corporate entity owned by Mr. Selzer and Joseph Glassman. It was formed to develop various franchises, including the Dunkin' franchises that were formed pursuant to the Agreement. A day before the Agreement was executed, the Individual Plaintiffs entered into a development agreement with AAA Development, in which they agreed that AAA Development would be the exclusive developer of the shops opened pursuant to the Agreement and that they would pay AAA Development a fee for each shop in the range of $350,000 to $400,000. Although Defendants admit that they knew

1

that there was a development arrangement between AAA Development and Individual Plaintiffs, the parties dispute whether Defendants knew about the development agreement itself or its terms.

Plaintiff AAA Yowza was formed to own a property at 2350 Mount Rose Avenue, York, Pennsylvania, which Plaintiffs hoped to develop into a Dunkin' shop.[1]  Mr. Levitt and AAA Yowza entered into a development agreement for Yowza on August 24, 2008.  Plaintiff Yowza Enterprises, incorporated on August 18, 2008, was created to be the corporate franchisee for a Dunkin' franchise located at the Yowza site.  Collectively, AAA Yowza, Yowza Enterprises, and AAA Development comprise the Corporate Plaintiffs.

   *1.   The Agreement*

The Agreement, which ultimately cost Individual Plaintiffs $500,000 (or $50,000 per store) in nonrefundable franchise fees, granted them limited exclusivity to build ten Dunkin' Donuts/Baskin-Robbins shops in the York, Pennsylvania area.  The Agreement set forth various dates by which stores had to be opened.  Before Defendants would approve a store site, the location proposed to be acquired had to be submitted in writing to Defendants.  Upon approval of the site by Defendants, the Agreement required the developer of the site to enter into a Franchise Agreement with Defendants.

Under the Agreement, if the Individual Plaintiffs defaulted on the Agreement and did not cure that default within thirty days of Defendants sending them a notice to cure, Defendants had the right to terminate the Agreement.  Plaintiffs state that Defendants were "required" to provide a notice to cure in the event of any default; however, the Agreement does not seem to explicitly "require" Defendants to do this unless they intended to terminate the Agreement because of that

---

[1]   This site is referred to herein as Yowza.

default. Under the Agreement, limited exclusivity could be revoked if Individual Plaintiffs failed to open the stores according to schedule, otherwise breached the Agreement or any franchise agreement, or failed to qualify for expansion under Defendants' franchise performance rating system.[2] The Agreement also provided that it could be transferred with Defendants' prior written consent.

Despite the fact that the Agreement purports to be the entire agreement between the parties, not to be amended without a fully executed written amendment, both sides point to other documents to dictate how the Agreement should be interpreted. For instance, Defendants point to Franchise Agreement language that states that site approval must be in writing from the Defendants and to Site Development Guide language that states the same. Defendants also point to the Site Development Guide as setting forth the site approval process in general; Plaintiffs contest that Defendants did not actually follow that process and that the Guide is nonbinding and even states that it is subject to change.[3]

Within the first three years that the Agreement was in effect, the Individual Plaintiffs opened three stores. On February 6, 2008, Defendants amended the Agreement by extending the store opening dates set forth in the original Agreement and also including "control dates," or deadlines by which Individual Plaintiffs were required to submit a control document – that is, a

---

[2] Defendants claim that in March 2007, Plaintiffs lost their exclusivity for failing to cure defaults described in a January 1, 2007 notice to cure. They cite to a March 2007 email from a Dunkin' employee to Mr. Levitt which notes that they lost exclusivity in return for an extension of certain control dates. Plaintiffs counter that the notice to cure did not mention loss of exclusivity and that under the contract, 30 days' written notice is required to terminate exclusivity. At the end of the day, however, the case does not hinge on this particular squabble, at least for purposes of these motions.

[3] Defendants rely heavily on their Global Development Tracking System, a computer program that tracks certain key dates in the site approval process, to support various factual assertions. Plaintiffs claim that this system's records are wrong with respect to them; for example, the system states that certain site approval letters were sent for stores in Plaintiff's store development area which were not actually sent.

binding lease, an executed letter of intent, or a purchase contract. Defendants add that this control document must be for an approved or approvable site, citing to a Site Development Guide which includes a checklist that states that the control document must state that it is subject to Dunkin' approval.[4] Plaintiffs argue that this control document definition was not included in the parties' Agreement or the amendment and point out that none of their three operating stores were approved prior to the submission of a "control document."

   2.   *Yowza*

Plaintiffs contend that as early as 2005, Michael Ryan, Defendants' Director of Development, verbally approved the Yowza site while touring it with Mr. Glassman, and that Mr. Ryan continued to reassure Mr. Glassman that the site would become a Dunkin' store. Mr. Ryan, however, contends that he never approved the site, and neither of the Individual Plaintiffs themselves nor any of the other individuals who Mr. Glassman said overheard the approval professed any personal knowledge of the verbal approval. Plaintiffs did submit a letter of intent for the Yowza site to Defendants in April 2007, after claiming that they had submitted a previous version "months ago," which Defendants stated they had not received. Defendants contend that this letter expired on May 20, 2007, but the language in the letter states that it would only expire if it was not executed by that date.

After Individual Plaintiffs missed a store opening deadline in July 2007, Mr. Ryan and Dunkin' employee Deb Wawer held a meeting with them and Mr. Glassman in September 2007 to discuss the Agreement. At the meeting Defendants offered to help Individual Plaintiffs find a

---

[4] This document does not seem to support Defendants' statement directly. Certainly, though, logic would dictate that a control document for just any site would not be appropriate, but rather only one that actually had potential and was a good faith submission, *i.e.*, an approvable site. There does not appear to be any language in any document cited by Defendants that states that the control document may only be for a site that has already been approved.

purchaser for the Agreement. The parties contradict one another when discussing just what this offer of help constituted – an actual promise to sell the Agreement or a simple offer of assistance. Contemporaneous emails include such statements as "Harold and I accept your offer to have Dunkin Brands locate a purchaser for the remaining 7 stores in our SDA." *See* Docket No. 99-2, ¶ 88. No one mentioned large franchisee Men at Work at this meeting.[5] There is a dispute as to whether the Yowza site and the approval of the same were also discussed at this meeting; follow up emails suggest at a minimum that Defendants did not expressly state that Yowza would not be approved as a Dunkin' site, and Plaintiffs claim Defendants said Yowza would be a Dunkin' no matter what. By the time of this meeting, most of the land development work on Yowza had already been completed; Mr. Glassman testified at deposition that before the meeting even happened, he intended to see the land development process through.

Whether the statements about selling the Agreement were promises or not, by mid-November 2007, Mr. Ryan had informed Individual Plaintiffs that Defendants were not going to sell the Agreement. Despite this, Mr. Glassman continued to contact Defendants about selling the Agreement/Yowza to Men at Work. Ms. Wawer told him she would bring him in at the right time, and Mr. Ryan told him to be patient.

In early 2008, Individual Plaintiffs found their own prospective purchaser. As noted above, at about this time Defendants amended the Agreement in writing to extend deadlines, which would enable a purchaser to buy the Agreement without already being in default.[6] The prospective purchaser, however, ultimately did not complete the purchase. Defendants claim

---

[5] Men at Work is a large Dunkin' franchisee which eventually took over the area covered by the Agreement. Plaintiffs contend that the motivation behind Defendants' breach and other tortious actions was a desire to give the Agreement area to Men at Work.

[6] Plaintiffs argue that this agreement to extend deadlines took place in early summer 2007, but was not memorialized in writing until February 2008.

that the purchaser dropped out on his own and point to testimony and affidavits from their employees to that effect. Plaintiffs claim that this employee testimony is self-serving and not to be credited, and that Defendants were the ones who sabotaged the deal because they planned to terminate the Agreement, but Plaintiffs do not point to any evidence in the record to support this argument. There is also some dispute as to whether, around this time, a real estate listing for the Yowza property changed from a lease of half of the premises to sale of the whole.[7]

Defendants state that in March 2008 they decided to "kill" the Yowza deal. Emails between Ms. Wawer and Mr. Ryan at this time confirm this. Whether or not information akin to a site review package had been submitted is in question; Plaintiffs argue that traffic studies and the like had all been submitted by this time, although a lease had not. According to Ms. Wawer, she told Mr. Levitt some time around this time period that Defendants would not be going forward with Yowza. No writing to this effect has been produced, and Mr. Levitt contends that he was not told this until much later.

   3.    *Termination of the Agreement*

A control document was due under the Agreement and its amendments on August 28, 2008. Even before this date, emails were circulating among Defendants' employees regarding the Agreement's likely termination for not meeting this date.

---

[7] Real estate broker Larry O'Brien testified that the listing changed on January 15, 2008 and that in January 2008 Mr. Glassman told him that the Yowza site was not approved; Plaintiffs claim he mixed up 2008 and 2009. In any case, there is a letter from Mr. Glassman to Mr. O'Brien dated January 15, 2008 which instructs Mr. O'Brien to change the Yowza real estate listing to add the option of a purchase of the site. *See* Docket No. 99, Ex. 70. In addition, the listing in January of 2007 stated that a partial lease of the Yowza site was available for a business interested in joining a Dunkin' Donuts to be built on the site. *See id.*, Ex. 113. As of January 16, 2008, the listing changed to offer the whole premises for sale, and there was no more mention of Dunkin' Donuts. *See id.*, Ex. 114.

A few days prior to the control date, Mr. Levitt submitted to Defendants a lease for the Yowza property. At the same time, the parties to the lease circulated a separate agreement, not submitted to Defendants and possibly never signed, which stated that the lease was signed to induce Defendants to extend the Agreement and that both parties could terminate the lease by written notification at any time without any reason prior to actual construction. Ms. Wawer received the lease and almost immediately returned the document with a cover letter stating that Individual Plaintiffs were not "Certified to Expand."[8] On the same day, Ms. Wawer spoke to Mr. Levitt and told him that Yowza was not approved because Defendants did not think it was a good site.[9] A few days later, Defendants sent Individual Plaintiffs a notice to cure which stated that they had failed to meet the control date by submitting a control document. The notice did not mention whether or not the Individual Plaintiffs were certified to expand.

After receiving the notice, Mr. Selzer emailed Ms. Wawer, contending that the Individual Plaintiffs had sent a valid control document, in the form of the Yowza lease, to which Ms. Wawer responded that Mr. Levitt was not certified to expand, as explained in her correspondence returning that lease. On October 2, 2008, Defendants sent Individual Plaintiffs a notice of termination, which stated in part that the Agreement was terminated because Individual Plaintiffs failed to meet the control date of August 28, 2008, to cure this default, or to obtain written consent for additional time to cure.

---

[8] Michael Ryan testified at deposition that even if a franchisee is not "certified to expand" when control documents are submitted, this would not affect the validity of the control document; the "certified to expand" classification matters at the time the franchise restaurant is slated to open. In addition, Mr. Levitt denies that he was not "certified to expand."

[9] Whether or not it was a good site is also hotly debated, as is whether site disapproval must be in writing.

Individual Plaintiffs brought this suit, claiming that Defendants breached the Agreement by terminating the Agreement without a valid reason to do so. Corporate Plaintiffs add related tort claims for fraudulent misrepresentation, promissory estoppel, and tortious interference with contractual relations.[10] After lengthy discovery, both sides moved for summary judgment as to the breach of contract claim, and Defendants moved for summary judgment as to the remaining claims. Because factual disputes abound, the Court will deny both motions as to the breach of contract claim and will deny Defendants' motion as to Counts III and VIII (the tortious interference claims). The Court will grant Defendants' motion as to the promissory estoppel and fraudulent misrepresentation counts.

**LEGAL STANDARD**

The standards by which a court decides a summary judgment motion do not change when the parties file cross-motions. *Southeastern Pa. Transit Auth. v. Pennsylvania Pub. Util. Comm'n*, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993). Upon motion of a party, summary judgment in a federal case is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

---

[10] The Amended Complaint includes the following counts: Count I – Breach of Contract [Harold Selzer and Saul Levitt], Count II – Promissory Estoppel [AAA Development], Count III – Tortious Interference with Contract [AAA Development], Count IV – Fraudulent Misrepresentation [AAA Development], Count VII – Promissory Estoppel [AAA Yowza], Count VIII – Tortious Interference with Contract [AAA Yowza], Count IX – Fraudulent Misrepresentation [AAA Yowza], Count X – Promissory Estoppel [Yowza Enterprises], and Count XI – Fraudulent Misrepresentation [Yowza Enterprises]. Counts V and VI were voluntarily withdrawn.

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

**DISCUSSION**

### A. Breach of Contract

Both Individual Plaintiffs and Defendants move for summary judgment as to the breach of contract claim. To make out a claim for breach of contract, "the plaintiff must establish (1) an oral or written agreement, express or implied; (2) for valid consideration; (3) performance or its equivalent by the plaintiff; (4) breach by the defendant; and (5) damage to the plaintiff." *Britton v. Athenahealth, Inc.*, No. MICV201202457, 2013 WL 2181654, at *6 (Mass. Super. 2013) (citing *Singarella v. Boston,* 173 N.E.2d 290, 291 (Mass. 1961)).[11] Because of the multitude of disputed factual issues in this case, neither side can prevail at this stage. The crux of both arguments is the reason for the termination. The notice to cure said it was for lack of a valid control document, but at the time and even during discovery in this litigation, Mr. Levitt's lack of certification to expand was offered as a reason why the control document was not accepted. There are disputes of fact as to whether Yowza was or should have been approved, whether any disapproval was communicated to Plaintiffs and when, what a "control document" actually is, what role the certification to expand (or lack thereof) played, and other issues that directly relate to whether the Yowza lease could have or should have been considered a valid control document.

---

[11] Under the Agreement, Massachusetts law applies.

The closest the parties come to an argument that could be decided based on the highly contested set of facts before the Court is Defendants' argument that the Yowza lease was merely a sham agreement, and therefore could not be a valid control document. Defendants point to contemporaneous emails, as well as testimony, that the lease was submitted solely to preserve the Agreement and that the parties did not intend for the lease to be binding. Defendants rely on *Marks v. Southcoast Hosp. Group, Inc.*, Nos. PLCV0201284 *et al.*, 2001 WL 36398868 (Mass. Super. Dec. 30, 2011), a case in which, after a bench trial, the Massachusetts Superior Court ruled that a sham agreement submitted merely to comply with a contract deadline was not valid and constituted a breach of the agreement. Plaintiffs counter that even if the lease was a sham lease, Defendants did not know about any of the contemporaneous emails and documents which they cite as evidence of this. Whether Defendants' knowledge of the sham at the time is relevant or not, because the supposed agreement that the lease would not be binding was never even executed, there is at least a dispute of fact as to whether the lease was binding or just a sham. Thus, this argument must fail as well.

Defendants also argue that because Individual Plaintiffs were not in a position to perform the contract, the breach of contract claim must fail regardless of whether Defendants breached the contract or not. *See Kanavos v. Hancock Bank & Trust Co.*, 479 N.E.2d 168 (Mass. 1985) (holding that plaintiff must have had the ability to perform contractual duties to complain of defendant's breach). Individual Plaintiffs claim that they had several potential sites in the development pipeline and that it was only Defendants' wrongful breach of contract and misinformation concerning the reasons for the Agreement's termination that prevented them from performing. Although perhaps a bit thin, Plaintiffs' evidence of their ability to perform is just enough to preclude summary judgment.

**B. Tort Claims**

    *1.     Fraudulent Misrepresentation*

The Corporate Plaintiffs base their fraudulent misrepresentation claims on statements allegedly made at the September 5, 2007 meeting. Viewing the facts in the light most favorable to Plaintiffs, those statements include (1) that Defendants had a buyer for the Agreement; (2) that the Individual Plaintiffs should stop development and not attempt to sell the Agreement on their own; (3) that Yowza would be a Dunkin' site as part of the sale of the Agreement; and (4) that AAA Development should continue to develop Yowza because it would become a Dunkin'.[12]

To establish fraudulent misrepresentation, a plaintiff must show "1) a misrepresentation; 2) a fraudulent utterance thereof; 3) an intention by the maker that the recipient will thereby be induced to act; 4) justifiable reliance upon the misrepresentation; and 5) damage to the recipient as the proximate result." *Powell v. First Republic Bank*, 274 F. Supp. 2d 660, 678 (E.D. Pa. 2003). Defendants argue that Plaintiffs cannot prove any of these elements.

As to Yowza Enterprises, an entity that was not even formed until well after the alleged misstatements, the Court can easily dismiss this claim; as it did not exist at the time, it could not have been the recipient of any statement, fraudulent or not.[13]

As to the other two Corporate Plaintiffs, Defendants argue that all of the alleged statements relate to future events, and that Plaintiffs cannot show that they were false statements because they cannot show that Defendants knew that they were false when they were made and

---

[12] Plaintiffs also claim that Defendants misrepresented that Men at Work would buy the Agreement, but the record is clear that Men at Work was not mentioned at the September 5, 2007 meeting.

[13] Although Plaintiffs argue in their briefing that they relied on the fraudulent misrepresentations in even forming Yowza Enterprises, that argument fails because it only shows that the *creators* of Yowza Enterprises may have relied on misstatements, not that Yowza Enterprises itself relied on them. Moreover, Plaintiffs seemed to admit that Yowza Enterprises' claims must fail at oral argument. *See* 12/7/12 Tr. at 42:2-44:11.

had no intention to follow through with them.  Plaintiffs argue that Defendants knew all along that the statements were false because they had already begun plotting to take back the territory in order to give it to Men at Work and were telling them to be patient and at the same time making no efforts to actually carry through on any promises.

Defendants counter that the evidence of Defendants' intent comes from emails and events that took place *after* the September 5, 2007 meeting.  Indeed, it does appear that the vast majority, if not all, of this evidence of intent comes from documents and testimony concerning events later in 2007 and in 2008.  For example, Plaintiffs claim Defendants wanted to give their franchise territory to Men at Work to appease them for opening other Dunkin' stores in Men at Work's territories.  However, this issue did not even arise until, at the earliest, December of 2007.  Likewise, the discussion about "killing" the Yowza deal between Ms. Wawer and Mr. Ryan did not take place until March 2008.  The closest Plaintiffs come to evidence that Defendants were lying at the September 5, 2007 meeting is Ms. Wawer's May 2008 entry into Dunkin's tracking program that "[Yowza] is not a good site.  Franchisee was working with a Developer who purchased the site, even though we said we would not approve it for a Dunkin." Docket No. 102, Ex. 129.  That statement, however, serves to undercut Plaintiffs' insistence that the site was approved or would be approved more than it suggests that Defendants made false promises in September of 2007.  Therefore, because Plaintiffs have not produced sufficient evidence that Defendants never intended to carry through on the promises they made at the September 5, 2007 meeting, the fraudulent misrepresentation claims must fail.

    2.    *Promissory Estoppel*

In Pennsylvania, the elements of promissory estoppel are: (1) misleading words; conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of

reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel. *Luther v. Kia Motors Am., Inc.*, 676 F. Supp.2d 408, 421 (W.D. Pa. 2009) (applying Pennsylvania law). Promissory estoppel comes into play when an express promise has been made and failure to enforce the promise would lead to injustice. *C&K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988). Corporate Plaintiffs assert that the same statements that form the basis of their fraudulent misrepresentation claim give them a cause of action for promissory estoppel.

For the same reason that its fraudulent misrepresentation claim fails, Yowza Enterprises' promissory estoppel claim fails. Yowza Enterprises was not even formed at the time the alleged promises were made, so Yowza Enterprises could not have received and relied on those promises to its detriment.

As to the other Corporate Plaintiffs, in order to make out a claim for promissory estoppel, Corporate Plaintiffs must show by clear and convincing evidence that they made a substantial change in position based on the promise. *See Catahama v. First Commonwealth Bank*, No. 2:10-cv-1140, 2011 WL 2533018, at *8 (W.D. Pa. June 24, 2011) (citing *Luther*, 676 F. Supp. 2d at 421-22). Here, Corporate Plaintiffs argue that they made a substantial change in position by continuing development work on the Yowza site and by not pursuing other development opportunities. However, they point to no evidence regarding precisely what development was done after the promises were made and do not contest their own deposition testimony that most of the development occurred before the September 5, 2007 meeting and that Mr. Glassman always intended to pursue full development of the Yowza site. Indeed, in their supplemental discovery responses, Plaintiffs do not even mention development costs as damages. *See* Defs.'

Mot., Ex. 37, p. 11-12.[14] Likewise, although Corporate Plaintiffs say they did not pursue other development opportunities, they fail to provide any evidence of what other opportunities they may have pursued, *i.e.*, they fail to provide evidence that they did anything differently because of the Defendants' promises.[15] *See, e.g., Luther*, 676 F. Supp. 2d at 422 (dismissing promissory estoppel claim when applicant for car dealership could not show that he would not have gone through the application process had he not been promised that he would be awarded a dealership). Corporate Plaintiffs, therefore, fall far short of the clear and convincing evidence they must present to avoid summary judgment on these claims.

        3.        *Tortious Interference*

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Restatement (2d) Torts § 766. Corporate Plaintiffs AAA Yowza and AAA Development claim that by maliciously breaching the Agreement with Individual Plaintiffs, all the while knowing about that the breach would impact the Corporate Plaintiffs, Defendants tortiously interfered with their contracts with Individual Plaintiffs. Defendants counter with cases that they claim hold that breach of a contract, without more, is not enough to support a tortious interference

---

[14]    At oral argument, counsel for Plaintiffs argued that there were engineering bills submitted in discovery to support these costs and expenses, as well as expert reports. *See* Dec. 7, 2012 Tr. at 62:20-63:3. However, none of these bills or reports have been mentioned or cited to in any of the summary judgment materials before the Court which the Corporate Plaintiffs reference in arguing that they have evidence of damages.

[15]    Moreover, the change in the Yowza real estate listing in early 2008 suggests that Corporate Plaintiffs were open to pursuing other development opportunities at that time, not that they had relied so heavily on Defendants' promises that they eschewed other business opportunities.

claim – that there must also be evidence that a defendant acted with the specific purpose of interfering with the plaintiff's contract. *See, e.g., Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998). The cases cited by Defendants on this point, however, tend to involve plaintiffs bringing both breach of contract claims and tortious interference claims, in which the plaintiffs claim that the breach of the contract between plaintiffs and defendants had effects on the plaintiffs' abilities to perform contracts with third parties. Here, however, Corporate Plaintiffs are the third parties directly affected by the breach of a contract to which they were not parties, a factual scenario much more closely aligned with the Restatement's definition of intentional interference with contractual relations. *See, e.g., Valley Forge Convention & Visitors Bureau*, 28 F. Supp. 2d at 952 (noting that to make out a claim for tortious interference, "the acts complained of must have been directed by the defendant to a third party and not the plaintiff").

Interference is intentional when "the actor knows an injury is certain or substantially certain to occur as a result of his action." *Total Care Sys. v. Coons*, 860 F. Supp. 236, 241 (E.D. Pa. 1994). Defendants claim that Corporate Plaintiffs have not provided sufficient evidence of intent. Plaintiffs have not provided evidence that Defendants even knew about AAA Yowza's Cost Reimbursement Agreement. However, because there is a dispute of fact as to whether Defendants knew about the agreement between AAA Development and the Individual Plaintiffs, and, consequently, whether Defendants knew that by breaching the Agreement the Individual Plaintiffs were certain to lose the ability to live up to those other agreements with the Corporate Plaintiffs, and because it is undisputed that Defendants knew about the Yowza lease, the tortious interference claims must survive, at least as to those two agreements.

Furthermore, for the same reasons that the breach of contract claim remains, the Court cannot determine whether, as a matter of law, Defendants' actions in terminating the Agreement were privileged. Finally, Defendants argue that to the extent the agreements between the Individual Plaintiffs and Corporate Plaintiffs were formed over a year after the alleged malicious plan to retake the Individual Plaintiff's territory was hatched, the plan could not have been made with the intention to interfere with as-yet nonexistent contracts. However, because Defendants' actions in allegedly breaching the Agreement continued to take place after the agreements between the Individual Plaintiffs and Corporate Plaintiffs were made and, again, because there is at least some evidence that Defendants knew about two of these agreements and the effect their actions would have on them, genuine issues of material fact remain with regard to Defendants' intent. For these reasons, then, the tortious interference claims will not be dismissed at this time.

**CONCLUSION**

For the foregoing reasons, the Court denies Plaintiffs' Partial Motion for Summary Judgment, and grants in part and denies in part Defendants' Motion for Summary Judgment. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge